[Cite as *State v. Quarterman*, 2024-Ohio-6095.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

    v.

ALEXANDER QUARTERMAN

    Appellant

C.A. No.     30776

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 22 09 3082(B)

DECISION AND JOURNAL ENTRY

Dated: December 31, 2024

---

FLAGG LANZINGER, Judge.

{¶1} Alexander Quarterman appeals his convictions and sentence from the Summit County Court of Common Pleas. For the following reasons, this Court affirms.

I.

{¶2} A grand jury indicted Quarterman and a co-defendant, Anthony Fowler, on the following four counts: (1) murder in violation of R.C. 2903.02(A); (2) felony murder in violation of R.C. 2903.02(B) with the predicate offense of felonious assault; (3) felonious assault in violation of R.C. 2903.11(A)(2) related to the use of a motor vehicle; and (4) felonious assault in violation of R.C. 2903.11(A) related to the use of a firearm. The counts of murder, felony murder, and the count of felonious assault related to the use of a firearm contained accompanying firearm specifications under R.C. 2941.145(A).

{¶3} The charges were based on allegations that Fowler struck D.P. from behind while Fowler was driving a red Jeep Cherokee, causing D.P. to fall to the ground. At the time of the

incident, D.P. was walking alone through a parking lot. The charges were also based on allegations that, after Fowler struck D.P., Quarterman (the front-seat passenger in the Jeep) shot D.P. in the neck as D.P. was attempting to get up from the ground. D.P. died at the scene as a result of the gunshot wound. Quarterman and Fowler pleaded not guilty and the matter proceeded to a jury trial.

{¶4} At trial, the State presented evidence from eight witnesses. The State's witnesses included Fowler's cousin, D.P.'s nephew ("Nephew"), the responding officers and detectives, the Chief Medical Examiner for Summit County, and a forensic scientist from the Bureau of Criminal Investigation ("BCI"). The defense presented no witnesses. This Court will briefly summarize the testimony of the State's witnesses.

{¶5} Nephew provided the following version of the events, some of which was supported by surveillance videos the State played for the jury. Nephew and D.P. went to a mini mart on the corner of Copley Road and Noble Avenue on July 17, 2022, to play video games. The video games were in the back room of the mini mart.

{¶6} While Nephew and D.P. were in the back room, Fowler and Quarterman arrived in a red Jeep Cherokee. Fowler was the driver and Quarterman was the front-seat passenger. After Fowler parked the Jeep, Quarterman entered the mini mart and went to the back room. Quarterman was purportedly looking for someone named "HD" who was not at the mini mart.

{¶7} Fowler entered the mini mart after Quarterman and grabbed a drink from one of the refrigerators. A surveillance video showed D.P. emerge from the back room, walk up to Fowler, and punch Fowler in the face as Fowler began to take a sip from his drink. A brief "scuffl[e]" ensued among D.P., Fowler, and Quarterman. During the altercation, some of Fowler's drink

spilled on Quarterman. Nephew testified that he helped break up the altercation. In doing so, Nephew felt what he thought was a gun on Quarterman's hip.

{¶8} Nephew helped escort Fowler and Quarterman out of the mini mart. A surveillance video showed Fowler exit the mini mart, walk back to the red Jeep, and get into the driver's seat. The video also showed Quarterman exit the mini mart while Nephew stood at the door to prevent Quarterman from re-entering. Nephew testified that Quarterman wanted to re-enter the mini mart to get his phone, but that he (Nephew) said he would get if for him. Nephew testified that Quarterman said "I'm going to get him[,]" referring to D.P., before Quarterman walked back to the red Jeep and got into the front passenger seat. The surveillance video showed that Quarterman took off his white t-shirt after exiting the mini mart, presumably because some of Fowler's drink spilled on him during the altercation. Fowler and Quarterman then drove out of the parking lot.

{¶9} Nephew and D.P. left the mini mart a few minutes later. Nephew drove D.P. to a friend's house a short distance from the mini mart. After dropping D.P. off, Nephew drove around the block a few times because he was "rattled" by the events at the mini mart. While driving, Nephew saw D.P. get out of a car at a street corner and begin walking through a parking lot. Nephew then saw the red Jeep speed up behind D.P. and strike D.P., causing D.P. to fall to the ground. Nephew then saw Quarterman, who was in the front passenger seat of the Jeep, get out of the Jeep and shoot D.P. The Jeep then sped away from the scene.

{¶10} In addition to surveillance videos from the mini mart, the State played a surveillance video that showed a red Jeep strike D.P. That video also showed D.P. attempt to get back up before being shot. The shooter is not visible in the surveillance video, nor is the driver of the red Jeep. None of the surveillance videos showed the license plate of the Jeep. According to Nephew, the Jeep he saw strike D.P. was the same Jeep he saw Fowler and Quarterman get into in

the parking lot of the mini mart. According to one of the detectives, the red Jeep in the surveillance videos was unique because it was missing the Jeep emblem on the front.

{¶11} The police arrived and observed that D.P. had sustained a fatal gunshot wound to his neck. Nephew told the police at the scene that men in a red Jeep struck and shot D.P. As part of their investigation, the police posted still images from the surveillance videos on social media. A few days after the shooting, Fowler's cousin, S.P., contacted the police.

{¶12} S.P. testified at trial, acknowledging that she was under subpoena and did not want to testify against Fowler. S.P. testified that she contacted the police because she learned that a car that looked like hers was involved in a shooting. S.P. claimed that she initially contacted the police because she was "drinking" and "paranoid." S.P. testified that she owned a red Jeep Cherokee, and that she loaned it to Fowler on or around July 17, 2022. S.P. acknowledged that her Jeep did not have a Jeep emblem on the front.

{¶13} The State questioned S.P. as to whether anyone was with Fowler when Fowler picked up the Jeep from her, whether she noticed any damage to her Jeep after Fowler returned the Jeep to her, and whether anyone was with Fowler when he returned the Jeep to her. S.P. testified that she did not remember whether anyone was with Fowler when Fowler picked up the Jeep, and that no one was with him when he returned the Jeep to her. S.P. also testified that she did not observe any new damage to the Jeep, but claimed that the Jeep had prior damage to the front hood.

{¶14} During S.P.'s testimony, the State and defense counsel went into the trial court's chambers to discuss the State's position that S.P.'s testimony was not consistent with her prior statement to the police. The State asked the trial court if it could show S.P. a video of her prior statement outside the presence of the jury to refresh S.P.'s recollection, which the trial court allowed. S.P. then continued with her testimony.

{¶15} Upon resuming her testimony, S.P. claimed that she did not remember what she previously told the police, nor whether she told the police the truth. S.P. acknowledged that she previously told the police that she observed damage to the hood of her Jeep when Fowler returned it to her, but claimed that she meant it was prior damage, not new damage. S.P. also testified that she previously assumed the Jeep involved in the shooting was her Jeep because it was a "look-alike."

{¶16} The police testified that they discovered two cartridge casings in the parking lot near D.P.'s body. The police also discovered a cartridge casing on the exterior window panel of S.P.'s Jeep, as well as a white t-shirt with a drink stain on it in the trunk. A forensic scientist with the BCI testified that the cartridge casings did not contain DNA, but that the white t-shirt contained a DNA profile consistent with Quarterman. Lastly, the Chief Medical Examiner testified that D.P. sustained a gunshot wound to the neck, which was fatal.

{¶17} The jury found Quarterman guilty of all the charges. Consistent with the State's recommendation, the trial court merged the count of murder and the count of felonious assault related to the use of a firearm with the count of felony murder for purposes of sentencing. The trial court sentenced Quarterman to a prison term of 15 years to life on the count of felony murder, a prison term of 3 years for the accompanying firearm specification, and an indefinite prison term of 7 to 10.5 years on the remaining count of felonious assault related to the use of a motor vehicle. The trial court ordered Quarterman's sentences to run consecutively for a total prison term of 25 years to life.

{¶18} Quarterman now appeals his convictions and sentence, raising four assignments of error for this Court's review.

ASSIGNMENT OF ERROR I

THE COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE THE VIDEOS, STATE'S EXHIBITS 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, AND 20.[1]

{¶19} In his first assignment of error, Quarterman argues that the trial court erred when it admitted the surveillance videos into evidence because the State failed to properly authenticate the videos. For the following reasons, this Court overrules Quarterman's first assignment of error.

{¶20} "When a defendant fails to contemporaneously object to the testimony, identification, and publication of photographs [and other items introduced as exhibits] to the jury, and only later objects, after the close of the State's evidence when the photographs [and other items] are being admitted into evidence, he forfeits the matter for review on appeal." (Alterations in original.) *State v. Henry*, 2016-Ohio-680, ¶ 10 (9th Dist.), quoting *State v. Sykes*, 2011-Ohio-293, ¶ 8 (9th Dist.); *State v. Watkins*, 2023-Ohio-2757, ¶ 20 (9th Dist.) (same). "Forfeiture precludes the consideration of all but plain error under Crim.R. 52(B)." *State v. Ricks*, 2010-Ohio-4659, ¶ 13 (9th Dist.). "This Court will not sua sponte undertake a plain-error analysis if the defendant fails to do so." *State v. Wheelock*, 2024-Ohio-1913, ¶ 14 (9th Dist.).

{¶21} Here, defense counsel did not object to the surveillance videos when the State played them during Nephew's testimony. Nor did defense counsel object when the State played some of the same videos during the testimony of two detectives. Instead, defense counsel objected to the admission of the videos when the trial court was admitting exhibits into evidence after the

---

[1] The record reflects that Exhibit 20 is an officer's bodycam video. While the caption of Quarterman's assignment of error references Exhibit 20, the body of his argument does not. Instead, the body of Quarterman's assignment of error refers solely to the surveillance videos admitted into evidence. Consequently, this Court will not address the trial court's admission of Exhibit 20. *See* App.R. 16(A)(7).

State had rested. As a result, Quarterman's argument is only subject to plain-error review. *Wheelock* at ¶ 14.

**{¶22}** In his merit brief, Quarterman argues that the trial court abused its discretion when it admitted the surveillance videos into evidence. Quarterman has not argued that the trial court committed plain error. This Court will not construct a plain-error argument on Quarterman's behalf. *Id.*; *State v. Paul*, 2024-Ohio-1874, ¶ 35 (9th Dist.). Accordingly, Quarterman's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE COURT COMMITTED REVERSIBLE ERROR IN MAKING A COMMENT IN FRONT OF THE JURY TO THE PREJUDICE OF MR. QUARTERMAN WHEN THE PARTIES AGREED THAT WITNESS [S.P.] COULD SEE A VIDEO OUTSIDE THE PRESENCE OF THE JURY FOR PURPOSES OF "REFRESHING HER MEMORY."

**{¶23}** In his second assignment of error, Quarterman argues that the trial court committed reversible error when it told the jury that S.P. was going to watch a video outside the jury's presence to refresh her recollection. For the following reasons, this Court overrules Quarterman's second assignment of error.

**{¶24}** "In exercising h[er] duty to control a criminal trial pursuant to R.C. 2945.03, the trial judge is to remain impartial and refrain from making comments which may influence a jury." *State v. McCarley*, 2006-Ohio-1176, ¶ 9 (9th Dist.). "Recognizing that juries are 'highly sensitive to every utterance by the trial judge,' the Ohio Supreme Court has determined that improper remarks by a trial judge may prejudice a defendant's right to a fair trial and representation by counsel." *State v. Zink*, 2023-Ohio-1250, ¶ 4 (9th Dist.), quoting *State v. Wade*, 53 Ohio St.2d 182, 188 (1978).

> Generally, in determining whether a trial judge's remarks were prejudicial, the courts will adhere to the following rules: (1) The burden of proof is placed upon

the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*Zink* at ¶ 4, quoting *Wade* at 188.

**{¶25}** Here, during S.P.'s testimony, the State and defense counsel went into the trial court's chambers to discuss the State's position that S.P.'s testimony was not consistent with her prior statement to the police. The State asked the trial court if it could show S.P. a video of her prior statement outside the presence of the jury to refresh S.P.'s recollection. The trial court indicated that it would instruct the jury to go to the jury room while the State played the video for S.P.

**{¶26}** Then, in front of the jury, the trial court stated: "we're going to take a break to refresh the witness's testimony by showing her a video." Defense counsel immediately requested a sidebar. During the sidebar, defense counsel argued that it was inappropriate for the trial court to tell the jury that the State was going to try to refresh S.P.'s recollection with a video. Defense counsel argued that doing so implied that S.P.'s trial testimony was inconsistent with her prior statement to the police. Defense counsel requested a mistrial, which the trial court denied. Defense counsel did not request a curative instruction. The State then played the video for S.P. outside the presence of the jury.

**{¶27}** After watching the video, S.P. continued with her testimony. As noted above, S.P. testified that she was under subpoena and did not want to testify against her cousin (Fowler). Throughout her testimony, S.P. claimed to not remember the details surrounding Fowler borrowing her Jeep, nor what she previously told the police.

{¶28} On appeal, Quarterman argues that the trial court's comment "sounded like the Court was opining that [S.P.] was not credible, and needed to testify differently." Quarterman acknowledges that "it is clear that the trial judge's comments were not made to persuade the jury or as a result of bias." Nonetheless, Quarterman argues that the issue is whether the trial court's comment prejudiced the defense.

{¶29} Having reviewed the record, this Court concludes that, even if the trial court's comment was inappropriate, Quarterman has not established that it deprived him of a fair trial. *Zink*, 2023-Ohio-1250, at ¶ 4 (9th Dist.). The State presented testimony from Nephew, who was involved in the altercation at the mini mart and testified that he witnessed the shooting. Nephew identified Fowler as the driver of the Jeep and Quarterman as the passenger. The State also presented surveillance videos showing the altercation at the mini mart, as well as a red Jeep striking D.P. from behind and D.P. being shot. The State further presented evidence indicating that a cartridge casing was found on the exterior window panel of S.P.'s Jeep, as well as DNA evidence confirming that Quarterman's t-shirt was in the back of S.P.'s Jeep. Thus, even absent S.P.'s testimony and the trial court's comment to the jury, this Court cannot say that the jury would not have found Quarterman guilty. *See State v. Horton*, 2017-Ohio-9078, ¶ 15 (9th Dist.) ("[I]n reviewing the evidence that was submitted to the jury, we can only conclude that, even absent the inappropriate comments, the jury would have found [the defendant] guilty.").

{¶30} Moreover, the trial court instructed the jury that "[i]f, during the course of the trial, the Court said or did anything that you consider an indication of the Court's view, you are instructed to disregard it." A "jury is presumed to follow the trial court's instructions, and [Quarterman] has not pointed to anything in the record that indicates that the jury failed to do so."

*State v. Jackson*, 2015-Ohio-5096, ¶ 55 (9th Dist.), quoting *State v. Boden*, 2013-Ohio-4260, ¶ 38 (9th Dist.).

**{¶31}** For the foregoing reasons, Quarterman's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE COURT FAILED TO ESTABLISH A FOUNDATION FOR CONSECUTIVE SENTENCES AND AS SUCH, ALEXANDER QUARTERMAN WAS DENIED DUE PROCESS IN THAT THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES IN VIOLATION OF R.C. 2929.14(C)(4), AND R.C. 2929.41(A), WHICH REQUIRES JUDICIAL FACT FINDING TO ESTABLISH FOUNDATION FOR A REVIEW OF CONSECUTIVE SENTENCE AND THUS TO PROVIDE APPELLATE REVIEW OF SAID SENTENCE.

**{¶32}** In his third assignment of error, Quarterman argues that the trial court failed to make the required findings under R.C. 2929.14(C)(4) prior to imposing consecutive sentences. This Court disagrees.

**{¶33}** "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence" that: (1) "the record does not support the trial court's findings under relevant statutes[,]" or (2) "the sentence is otherwise contrary to law." *State v. Marcum*, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶34}** Under R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. First the trial court must find that: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender . . . ." R.C. 2929.14(C)(4). Second, the trial court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public . . . ." *Id.* Third, the trial court must find at least one of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶35} "[A] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry . . . ." *State v. Bonnell*, 2014-Ohio-3177, syllabus. A trial court is not, however, required to explain its findings before imposing consecutive sentences. *Id.* "[T]he record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences[,]" but:

a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld.

*Bonnell* at ¶ 28-29.

{¶36} Here, the State asked the trial court to run Quarterman's sentences consecutively "based on his criminal history." While addressing Quarterman, the trial court noted that "[t]here have been violent convictions in your record." The trial court indicated that it was going to follow the State's recommendation and ordered Quarterman's sentences to run consecutively. In doing so, the trial court determined that "[t]he consecutive sentences for Mr. Quarterman I feel is needed to protect the community." In its subsequent sentencing entry, the trial court stated that:

consecutive service is necessary to protect the public from future crime or to punish the offender and is not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public and the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public form future crime by the offender.

{¶37} This Court's review of the record indicates that the trial court made the required findings under R.C. 2929.14(C)(4) prior to imposing consecutive sentences. The trial court acknowledged Quarterman's criminal history and determined that consecutive sentences were necessary to protect the community. While the trial court's findings were not a word-for-word recitation of the statute, that is not required. *Bonnell*, 2014-Ohio-3177, at ¶ 29. A review of the record indicates that the trial court engaged in the correct analysis and that the record supports its findings. *See id.* Consequently, Quarterman's third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY NOT FINDING THAT MURDER AND COUNT 3 FELONIOUS ASSAULT ARE ALLIED OFFENSES OF SIMILAR IMPORT AND BY THEN SENTENCING HIM TO CONSECUTIVE TERMS FOR EACH ONE OF THEM.

{¶38} In his fourth assignment of error, Quarterman argues that the trial court erred when it failed to merge his conviction for felonious assault related to the use of a motor vehicle in violation of R.C. 2903.11(A)(2) with his conviction for murder in violation of R.C. 2903.02(A). This Court disagrees.

{¶39} As the Ohio Supreme Court has stated:

Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*State v. Ruff*, 2015-Ohio-995, paragraph three of the syllabus. "The analysis of allied offenses is specific to the facts of each case drawn from evidence at trial . . . ." *State v. McKnight*, 2023-Ohio-

1933, ¶ 4 (9th Dist.), citing *Ruff* at ¶ 26. Offenses are of dissimilar import if the defendant's conduct involves separate victims or "if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. "We review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25." *State v. Bailey*, 2022-Ohio-4407, ¶ 6.

{¶40} At trial, defense counsel argued that all of Quarterman's convictions should merge because this was "one continuous act." As noted above, the trial court merged the count of murder and the count of felonious assault related to the use of a firearm with the count of felony murder. The trial court did not merge the count of felonious assault related to the use of a motor vehicle to strike D.P. On appeal, Quarterman argues that "[t]he act of colliding into the victim and shooting him was all the same animus, that is with the purpose and immediate motive to kill the singular victim. The harm . . . that resulted from the continuous conduct is not separate and identifiable, but rather one and the same, to wit: death."

{¶41} This Court concludes that the trial court did not err when it did not merge Quarterman's conviction for felonious assault related to the use of a motor vehicle with his conviction for murder. Simply put, Quarterman has not established that the State relied upon the same conduct to support both offenses. *State v. Hunter*, 2018-Ohio-568, ¶ 20 (9th Dist.), quoting *State v. Fedrick*, 2017-Ohio-2635, ¶ 18 (9th Dist.). ("'It is the defendant's burden to establish his or her entitlement to the protections of Section 2941.25.' . . . 'To do so, the defendant must show that the State relied upon the same conduct to support both offenses.'").

{¶42} At trial, the State presented evidence indicating that Fowler struck D.P. from behind while driving the Jeep, causing D.P. to fall to the ground. This was the basis of the felonious assault charge related to the use of a motor vehicle. The State also presented evidence indicating that Quarterman—the front-seat passenger of the Jeep—then shot D.P. as D.P. was attempting to

get up from the ground. D.P. died as a result of the gunshot wound. This was the basis of the murder charge. The State argued that Quarterman and Fowler were guilty of the charged offenses either as the principal offender, or based upon the theory of complicity. Because the State did not rely on the same conduct to support both offenses, the trial court did not err when it did not merge the offenses. *See Hunter* at ¶ 20. Quarterman's fourth assignment of error is overruled.

III.

**{¶43}** Quarterman's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

CARR, J.
STEVENSON, P. J.
CONCUR.

APPEARANCES:

RICHARD P. KUTUCHIEF, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.